**UNITED STATES of America**
v.
**Adam BAGDASIAN.**
Crim. No. 24837.

United States District Court
D. Maryland.
Nov. 10, 1960.

Leon H. A. Pierson, U. S. Atty., Robert E. Cahill and H. Russell Smouse, Asst. U. S. Attys., Baltimore, Md., for plaintiff.

James B. Murphy, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

Defendant, indicted under thirteen counts for violating 18 U.S.C.A. § 1343,[1] has been tried by the court without a jury. In substance the indictment charges that defendant, having devised a scheme to defraud and to obtain money by falsely representing that he was employed as manager of a bookmaking establishment in a position to cheat his employer by placing bets after races had been run, visited John Allen and E. R. Culpepper in Virginia and proposed to them that they permit him to place such bets in their names and that they split their winnings with him; that defendant thereafter made a number of telephone calls from Maryland to Virginia in which he made various false statements to induce Allen and Culpepper to put up money in furtherance of the pretended plan, and actually persuaded Culpepper to send him by telegraph from Virginia to Maryland five Western Union money orders in the total sum of $8,500.

Findings of Fact

On July 9, 1957 defendant inspected an apartment at 6906 Westmoreland Ave., Takoma Park, Maryland, and arranged for a lease for the apartment which was made under the name Harold Green. Two days later defendant or a confederate caused the telephone company to furnish telephone service to that apartment, which was assigned the number Juniper 9–2890, listed in the name of Harold N. Green.

Shortly after the middle of 1957, defendant, using the name George Simon,

1. Sec. 1343 provides:
"Fraud by wire, radio, or television
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money, or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

went to Norfolk and called on E. R. Culpepper, who operated a reducing salon in Norfolk and a building supply business in Suffolk, Virginia. Defendant said that he was working for a rich bookmaker and was in a position to place bets after a race had been run and the winner known. He proposed to Culpepper that the latter "phone in horses" to a given number; that defendant, being in charge of the account, would place the bets on winners after the races were run; and that they would split the winnings half and half. Culpepper agreed to the proposition. Defendant said that a pick-up man named Lou Harris would call on Culpepper the next day and tell him what to do, and would collect and pay off weekly. Lou Harris called on Culpepper the following day, and told him to telephone his bets in to the Juniper number, and to identify himself as "89 for Lou".

After further urging by defendant over the telephone, Culpepper sent in his first bets on or about Wednesday, July 31. That night defendant telephoned, saying they had won $1,400 and that Friday was pay day, but suggesting that since the amount was so small Culpepper "let it go" until the following week and bet "round robins", described in court as "three-way parlays".

During the next week Culpepper bet $400 or $500 a day on losers and by the end of the week was $3,500 behind. Defendant telephoned Culpepper several times that week explaining that he had been unavoidably out of the office, and in the course of one of the calls told Culpepper to pay the pick-up man $3,500 on Friday, August 9. Culpepper was unable to make this payment, so defendant telephoned on Friday, August 9, and again on Saturday morning, August 10, saying he had borrowed $2,000 and would go on with the arrangement if Culpepper would send $1,500 by Western Union to Annapolis, Maryland, to be picked up by defendant in the name of Larry Ford. Culpepper sent the $1,500 by Western Union

Telegraph money order on Saturday, August 10, from Norfolk to Annapolis, using the name of one of his employees as the sender. In accordance with defendant's instructions, Culpepper told Western Union to waive identification, but to ask a test question, the answer to which was "Boat number 101".[2] Defendant picked up the money order at the Western Union office in Annapolis, giving the proper answer to the test question. He then collected the money, endorsing the name Larry Ford on the reverse of the money order.

That night defendant telephoned Culpepper saying that he had gotten the money and they had won $15,000 that day. On Monday, August 12, defendant telephoned Culpepper and persuaded him to send $2,000 by money order from Suffolk to Annapolis to pay off the supposed loan. On Wednesday Culpepper bet on three horses; defendant telephoned him that they had won $11,000 more and that $26,000 would be paid to Culpepper on Friday, August 16. However, defendant telephoned again on Wednesday or Thursday saying that his boss was upset because the $3,500 had not been paid to the pick-up man on the previous Friday, and that the boss insisted upon a deposit of $5,000. Defendant told Culpepper not to wire the $5,000 in one lump, but to send $2,000, wait a few minutes, send another $2,000, wait a few more minutes and send $1,000, all payable to Larry Ford. Defendant followed these instructions, sending the money by telegraph on Thursday, August 16, from Suffolk to Annapolis, where defendant picked up the money orders and cashed them.

Culpepper did not receive any money from defendant or Harris or anyone else on Friday, August 16, but defendant telephoned saying that he had lost $2,800 of the deposit money in a crap game and that Culpepper would have to send that amount again before he could be paid off. At long last Culpepper realized that he was dealing with a crook, told defendant so, and reported the matter to the F.B.I.

2. This procedure was followed in each instance when Culpepper sent money by telegraph from Norfolk or Suffolk to Annapolis.

Defendant made essentially the same proposition to John Allen, of Newport News, Virginia, who flirted with the proposition, but never agreed with defendant on the proposed split. Lou Harris called on Allen, gave him the Juniper number, and told him to identify himself as "103 for Lou". Allen testified that he had good sources of information and tips, that he phoned in a number of "legitimate" bets to the Juniper number, that most of his horses won, that defendant called him saying he was entitled to receive some $18,000, but that no money was ever paid to him. Defendant made a number of telephone calls to Allen urging him to accept and act on defendant's proposal, saying that Allen would have to make a deposit of $5,000 before his "legitimate" winnings could be paid, and telling a curious story about having pawned a watch and ring belonging to the boss. Allen, however, was wiser than the dog in Aesop's fable, and would not drop his own meat to snatch at a shadow.

### Discussion of the Evidence

Defendant was identified by Allen and Culpepper as the George Simon who made the propositions to them in Virginia and later called them repeatedly on the telephone, and by two witnesses as the Larry Ford who picked up and endorsed the several money orders. He was also identified by the witness Daugherty as the man to whom Daugherty had shown the Takoma Park apartment, and by Mrs. Daugherty as the man who signed the lease and who came back later asking about linen service.

Defendant did not take the stand and offered no evidence except that of a handwriting expert who testified that in his opinion defendant did not write the information on the apartment lease which Mrs. Daugherty testified he had written. The government's expert agreed. Neither expert could say whether defendant endorsed the name Larry Ford on the money orders.

Defendant contends that the expert opinion evidence destroys the testimony of Mr. and Mrs. Daugherty that defend-ant leased the Takoma Park apartment. Mrs. Daugherty was probably mistaken in her testimony that defendant signed the lease agreement and wrote the other information thereon. But it does not follow that Mr. Daugherty was wrong in identifying defendant as the man to whom he showed the apartment, nor even that Mrs. Daugherty was wrong in identifying defendant as the man who inquired about the linen. Other evidence connects defendant with the apartment, and it is clear that at least one other man, Lou Harris, was involved in the scheme. Telephone service for the apartment was arranged for on July 11; Harris gave the number to Allen and Culpepper; Culpepper recognized defendant's voice on one occasion when he called in his bets; on other occasions he heard two or more voices, which sounded like a "regular bookie place"; the records of the telephone company show four calls to Allen's number and two to Culpepper's number made from that phone, and two other calls to Culpepper's phone were made from other stations in Maryland and charged to the Juniper number; the tenants abandoned the apartment at the end of the first month, August 9, and it was on or about that date that defendant told Culpepper not to phone in any more bets to the Juniper number, that defendant would put in the horses himself. It should be added that defendant is rather striking in appearance and likely to be remembered.

Defendant also questions the evidence of the two Western Union clerks identifying him as the Larry Ford who picked up the money orders at Annapolis, because one of them said she did not remember being shown any photographs by the F.B.I. agents while the other said that photographs had been shown to both of them. This discrepancy is not fatal, because both witnesses were positive and convincing in their identification of defendant and gave persuasive reasons for recalling the incident—the size and frequency of the money orders and the odd answer to the test question, "boat number 101".

Finally, defendant argues that there is no evidence to show that he was not the manager of a bookmaking office, in a position to do what he said he would do, and that the only scheme proved is a scheme to defraud his employer, in which Culpepper joined but Allen refused to join. There is evidence, however, from which I infer and find that defendant suggested the proposal to cheat his supposed employer as a trap for the unwary, and that he intended to double-cross his ostensible partners, actually his victims, and succeeded in doing so in the case of Culpepper. No payment was made to Culpepper on Friday, August 16, when, according to defendant's statements Culpepper was entitled to receive some $26,000; Allen was never paid his "legitimate" winnings; the proposals to Allen and Culpepper were specious, and the pretended reasons for asking them to send money to defendant were implausible. Culpepper's testimony illustrates the old Scottish proverb that the greedy man and the swindler are soon agreed.

Although I do not hold against defendant the fact that he did not take the stand, he did not rebut the evidence tending to prove the fraudulent scheme charged in the indictment. If he had in fact been employed as manager of a bookmaking office in or around Washington he could have summoned to this court persons who could testify to that fact. If defendant had intended to cheat his employer he would scarcely have used the office phone to make so many long distance calls to his accomplice; but if he intended to cheat the supposed accomplice it would be natural for him to make such calls from the same number to which his dupes were told to phone their bets. I am convinced beyond a reasonable doubt that defendant devised the scheme charged in the indictment, and in furtherance of the scheme made many long distance calls to Allen and Culpepper in Virginia and induced Culpepper to send him money by telegraph from Virginia to Maryland.

### The Several Counts

The first four counts charge telephone calls to Allen on specific dates; the second four counts charge telephone calls to Culpepper on specific dates; the last five counts charge defendant with causing Culpepper to send him by telegraph from Virginia to Maryland the five Western Union money orders offered in evidence.

There is no reasonable doubt about defendant's guilt as charged in the last five counts. Nor is there any reasonable doubt that defendant made many long distance calls to Allen and Culpepper in furtherance of the scheme. But the government furnished an answer to a demand for a bill of particulars of the first eight counts, in which it undertook to give the substance of the several calls which form the basis of those counts. The government proved that calls were made on the dates referred to in counts two to eight, and that calls were made in which the substance of the conversation was as set out in the particulars furnished; but except with respect to counts seven and eight [3] I find as a fact that the government failed to tie in sufficiently the dates and substance of the calls.

### Conclusion

I, therefore, find defendant guilty as charged in counts seven, eight, nine, ten, eleven, twelve and thirteen, and not guilty as charged in the first six counts.

3. The particulars with respect to counts seven and eight were as follows:

"Count VII. On August 6, 1957 from Silver Spring, Maryland to Suffolk, Virginia. It is alleged that the defendant made this telephone call, using the name 'George Simon'. The defendant advised Culpepper that because he had been out of his office he had been unable to mark Culpepper's bets, and as a result Culpepper was a large sum of money behind."

"Count VIII. On August 9, 1957 from Annapolis, Maryland to Suffolk, Virginia. It is alleged that the defendant made this telephone call, using the name 'George Simon'. The defendant advised Culpepper that Culpepper was still $1500.00 behind, that Culpepper should send that amount to Annapolis, Maryland to Larry Ford, and that if Culpepper sent the money, the defendant would be able to mark bets in the future."